# NO. 12-16-00312-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF M. G.,* | § | *APPEAL FROM THE* |
| *A CHILD* | § | *COUNTY COURT AT LAW* |
| | § | *CHEROKEE COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

C.G. and G.G. appeal the termination of their parental rights. In four issues and six issues, respectively, C.G. and G.G. challenge the trial court's termination order. We affirm.

### BACKGROUND

C.G. and G.G. are the parents of M.G. On September 8, 2015, the Department of Family and Protective Services (the Department) filed an original petition for protection of M.G., for conservatorship, and for termination of C.G.'s and G.G.'s parental rights. The Department was appointed temporary managing conservator of the child, and the parents were appointed temporary possessory conservators with limited rights and duties to the child.

At the conclusion of the trial on the merits, the jury found, by clear and convincing evidence, that C.G.'s and G.G.'s parental rights should be terminated. The trial court found, by clear and convincing evidence, that C.G. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between C.G. and M.G. was in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between C.G. and M.G. be terminated.

Further, the trial court found, by clear and convincing evidence, that G.G. had engaged in one or more of the acts or omissions necessary to support termination of his parental rights under

subsections (D), (E), (O), and (Q) of Texas Family Code section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between G.G. and M.G. was in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between G.G. and M.G. be terminated. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his first, second, third, and fourth issues, G.G. argues that the evidence is legally and factually insufficient to support the jury's finding that he engaged in one or more of the acts or omissions necessary to support termination of his parental rights. As part of her first issue, C.G. contends that the jury's verdict is not supported by clear and convincing evidence.

### Applicable Law

A finding of only one ground for termination alleged under section 161.001(b)(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.–Fort Worth 2007, no pet.). Thus, to be successful on appeal, G.G. and C.G. must establish that the trial court's findings on all the Department's pleaded grounds are unsupported by the evidence. *See Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.–Houston [1st Dist.] 2009, no pet.). When a parent does not challenge an independent ground that may support an order of termination, and the trial court found that termination was in the child's best interest, we cannot address any of the grounds for termination. *See In re A.V.*, 113 S.W.3d 355, 361–62 (Tex. 2003); *Fletcher*, 277 S.W.3d at 64. Instead, we must overrule the challenges the parent has chosen to assert. *See In re A.V.*, 113 S.W.3d at 361-62; *Fletcher*, 277 S.W.3d at 64.

### Father's Issues

G.G. contends in his statement of issues that the evidence does not support termination of his parental rights under subsections (1)(D) (endangerment by conditions or surroundings), (1)(E) (endangerment by conduct), (1)(O) (failure to comply with a court-ordered service plan), or (1)(Q) (knowingly engaging in criminal conduct and inability to care for the child), of Texas Family Code section 161.001(b). However, in the body his brief, G.G. fails to challenge the jury's findings on the grounds for termination alleged under subsections (1)(D) (endangerment by conditions or surroundings) or (1)(Q) (knowingly engaging in criminal conduct and inability to care for the child). Because G.G. does not challenge every ground upon which the jury could

2

have based its decision to terminate his parental rights, we do not address the unchallenged findings or the grounds he chose to challenge in his brief. *See In re A.V.*, 113 S.W.3d at 361-62; *Fletcher*, 277 S.W.3d at 64.

## Mother's Issues

C.G. argues that the jury's verdict is not supported by clear and convincing evidence because she substantially complied with the service plan under subsection (1)(O) (failure to comply with a court-ordered service plan). However, C.G. does not specifically challenge the jury's findings on the grounds for termination alleged under subsections (1)(D) (endangerment by conditions or surroundings) or (1)(E) (endangerment by conduct). Because C.G. does not challenge every ground upon which the jury could have based its decision to terminate her parental rights, we do not address the unchallenged findings or the grounds she chose to challenge in her brief. *See In re A.V.*, 113 S.W.3d at 361-62; *Fletcher*, 277 S.W.3d at 64.

## Conclusion

Accordingly, we overrule G.G.'s first, second, third, and fourth issues, and that part of C.G.'s first issue regarding unchallenged findings.

### INADEQUATELY BRIEFED ISSUES

In his sixth issue, G.G. contends that the child's attorney ad litem did not provide competent legal representation prior to, and during, the trial, because the attorney ad litem did not comply with the mandatory requirements. As part of her first issue, C.G. argues that because the Department intended to return the child to her, the Department "waived" any evidence regarding termination prior to making that decision. She also contends in her second, third, and fourth issues that the trial court erred by admitting records produced after the discovery deadline, by not allowing her counselor to testify at trial, and by allowing the alternate juror to be present during deliberations.

## Applicable Law

Rule 38.1 of the Texas Rules of Appellate Procedure sets forth what must be included in an appellant's brief. *See* TEX. R. APP. P. 38.1. Rule 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). The appellate court has no duty to brief issues for an appellant. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.).

3

The failure to provide appropriate record citations or a substantive analysis waives an appellate issue. *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 460 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding that failure to offer argument, citations to record, or citations to authority waives issue on appeal); *Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 732 (Tex. App.—Corpus Christi 2005, pet. denied) (same); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (holding appellate court has discretion to deem issues waived due to inadequate briefing). References to sweeping statements of general law are rarely appropriate. *Bolling v. Farmers Branch Ind. Sch. Dist.*, 315 S.W.3d 893, 896 (Tex. App.—Dallas 2010, no pet.). Appellate courts must construe briefing requirements reasonably and liberally, but a party asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law support its contentions. *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

An appellate court has no duty—or even right—to perform an independent review of the record and applicable law to determine whether there was error. *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). Were we to do so, we would be abandoning our role as neutral adjudicators and become an advocate for that party. *Id.*

Moreover, as a predicate to presenting a complaint on appeal, the complaining party must have preserved the error at trial by a proper request, objection, or motion stating the grounds for the ruling that the party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, and then securing a ruling on the request, objection, or motion. *See* TEX. R. APP. P. 33.1(a)(1)(A), (2); *K.M. v. Tex. Dep't of Family & Protective Servs.*, 388 S.W.3d 396, 405 (Tex. App.—El Paso 2012, no pet.). Appellate review of potentially reversible error in a parental termination case never presented to a trial court undermines the legislature's dual intent to ensure finality in these cases and expedite their resolution. *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003).

**Father's Issues**

In this case, G.G. briefly stated his sixth issue along with his other issues, but does not provide any argument for issue six in the body of his brief. He does not provide any citations to the record, substantive legal analysis, or citations to authority in support of this complaint. *See Sweed v. City of El Paso*, 195 S.W.3d 784, 786 (Tex. App.—El Paso 2006, no pet.) (stating that

4

"merely uttering brief conclusory statements" is not a discussion of the facts and authorities relied upon contemplated by Rule 38). In the absence of any legal analysis, citations to the record, and citations to appropriate authorities, G.G. presents nothing for our review regarding his sixth issue. *See WorldPeace*, 183 S.W.3d at 460; *Med. Specialist Group*, 171 S.W.3d at 732.

Moreover, G.G. did not complain to the trial court that the child's attorney ad litem did not provide competent legal representation prior to, and during, the trial because the attorney ad litem did not comply with the mandatory requirements. Consequently, he waived his sixth issue on this basis as well. *See* TEX. R. APP. P. 33.1(a)(1)(A), (2).

## **Mother's Issues**

As part of her first issue, C.G. contends that because the Department intended to return the child to her, the Department "waived" any evidence regarding termination prior to making that decision. She also presents three conclusory arguments for her second, third, and fourth issues in her brief. These last three arguments, together, total three and one-half pages. She provides no specific citations to the record, substantive legal analysis, or citations to authority in support of these complaints. Further, C.G. contends that the trial court committed "fundamental error" as to each claim, without explanation or citation to authority. She does not refer to, or provide any, legal authority or analysis to support these claims. *See Sweed*, 195 S.W.3d at 786. In the absence of any legal analysis, citations to the record, and citations to appropriate authorities, C.G. presents nothing for our review regarding her second, third, and fourth issues, and that part of her first issue regarding waiver. *See WorldPeace*, 183 S.W.3d at 460; *Med. Specialist Group*, 171 S.W.3d at 732.

Moreover, C.G. did not complain to the trial court that it erred by not allowing her counselor to testify at trial, and by allowing the alternate juror to be present during deliberations. Consequently, she waived her third and fourth issues on this basis as well. *See* TEX. R. APP. P. 33.1(a)(1)(A), (2).

## **Conclusion**

Accordingly, we overrule G.G.'s sixth issue, and C.G.'s second, third, and fourth issues, and that part of her first issue regarding waiver.

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2016); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2016); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## Standard of Review

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

6

We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## Best Interest of the Children

In G.G.'s fifth issue and as part of C.G.'s first issue, they contend the evidence is legally and factually insufficient to support a finding that termination of their parental rights is in the child's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2016). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the

7

willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d 494, 507 (Tex. App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29. We apply the statutory and *Holley* factors below.

**Analysis**

This case began on September 6, 2015 when law enforcement responded to a complaint of a disturbance involving G.G. and an allegation that weapons were involved. Officers with the Cherokee County Sheriff's office responded and discovered C.G. at her home, intoxicated. One of the officers stated that C.G. could hardly stand up or talk to him, and slurred her words. He found her to be compliant, but a little belligerent. Another officer investigated the complaint and stated that G.G.'s and C.G.'s neighbors accused G.G. of threatening them with a knife. The second officer called the Department because he believed it would not be appropriate to leave M.G. with C.G. due to her state of intoxication. Law enforcement arrested G.G. for aggravated assault. However, C.G. was also arrested for disorderly conduct because of her behavior after she discovered that M.G. was being removed by the Department. One of the officers stated that C.G.'s demeanor progressively worsened until she was loudly cursing and threatening him and the neighbors. The Department investigator also stated that C.G. appeared intoxicated because

8

she had difficulty talking and maintaining her concentration, and slurred her speech. According to the investigator, C.G. was very irritable and erratic, and eventually had to be restrained with handcuffs. C.G. also yelled and cursed at the investigator.

The investigator believed that M.G. had to be removed because both parents were being arrested, and that both parents placed their child in danger. Moreover, she said, the house was infested with roaches, cluttered to the point of being a fire and safety hazard with access to numerous rooms being blocked, and did not contain much food beyond beer and wine. She did not believe that the environment was appropriate for a four-year old. M.G. was taken to a shelter that night.

*G.G.'s criminal record*

G.G. has an extensive criminal record beginning in 1996. He was arrested for criminal mischief, assault against C.G., terroristic threat, unlawful possession of a firearm by a felon, and burglary of a habitation. He was convicted of delivery of a controlled substance, a state jail felony, in 1996; burglary of a habitation, a second degree felony, in 2003; and assault family violence, a second degree felony enhanced, in 2013. G.G. went to jail on February 22, 2016. His community supervision for the assault family violence offense was revoked in 2016 and he was sentenced to five years of imprisonment. G.G. was also found guilty of aggravated assault with a deadly weapon, a second degree felony, and on July 6, 2016, he was sentenced to five years of imprisonment.

*Drug and alcohol abuse*

Both G.G. and C.G. admitted that they had problems with alcohol. G.G. stated that in the past, he had smoked marijuana, and used methamphetamines and cocaine. He admitted that in 2013, he would drink daily until he passed out. G.G. stated that during two Department cases involving M.G., he used cocaine or methamphetamines. He testified that he used cocaine after quitting methamphetamines even after participating in drug treatment in 2013. The Department conservatorship worker, Lisa Foreman, stated that G.G. tested positive for cocaine at the beginning of this case.

C.G. testified that she was an alcoholic. She said that in 2009, she passed out from drinking alcohol while her older child was in her custody. That child was eight years old at the time of the incident. At the time, a Department investigator testified that C.G. told him that she had relapsed, had a history of drinking, and had been sober before becoming depressed. In this

9

case, C.G. stated that she completed a twelve-step substance abuse program in 2016. However, she admitted that she relapsed at least three times in the past year, including a month before trial. Laurie Beamon, a conservatorship worker with the Department, stated that it was hard for a parent to show sobriety when relapses occur late in a case. Foreman did not believe that C.G. demonstrated the ability to stay sober and in recovery.

*Mental Health*

G.G. testified that he received disability for bipolar disorder, a heart condition, and high blood pressure. He had been taking Abilify for his bipolar disorder. Even though he received disability, he had been employed as a ranch hand, receiving cash for his work and hiding it. According to records from ACCESS (Anderson-Cherokee Community Enrichment Services), C.G. was diagnosed with major depressive disorder with anxious distress, alcohol dependence, and borderline personality disorder. C.G. has been prescribed Prozax and Xanax. She is also on disability for major depression and anxiety, and has been for approximately six years.

*Previous Department Cases*

C.G. is the mother of two older children, both of whom live with their fathers. There was testimony regarding two previous incidents during which the Department became involved. In 2006, the police discovered C.G.'s older daughter barefoot by the apartment complex office and her house was determined to be unsafe and unsanitary. C.G. stated that she was drinking at the time. The investigator for the 2009 incident stated that the Department investigated C.G. twice in 2006, resulting in one "reason to believe" for negligent supervision and physical neglect, and one "reason to believe" for negligent supervision.

Another investigation by the Department occurred when C.G. passed out in 2009 while with her older child. An investigator with the Department testified that C.G. had to be taken to the emergency room along with the child. He said that C.G.'s older child was upset, distraught, and filthy. He described the child's clothes as being threadbare and worn out. C.G. was "highly intoxicated," belligerent, angry, cursing, and loud. The investigator stated that C.G.'s alcohol level was well above the legal limit for intoxication. He said her house was thoroughly infested with roaches, describing a "waterfall" of roaches falling out of the woodwork when she opened the front door.

Beamon testified that in 2011, she received an intake involving M.G. The report stated that G.G. was allegedly chasing people with a knife and that there was possible drug use in the

home. She described the home as cluttered, and some rooms were inaccessible due to items blocking the entrances. The parents were asked to submit to drug testing, but G.G. had shaved his head and all of his body hair. Beamon testified that the Department has had six investigations involving C.G. and three involving G.G. There had been three investigations involving M.G., including the current investigation. She also stated that the home conditions were almost identical in each investigation, as was C.G.'s pattern of using alcohol to the point of passing out.

*Service Plan*

G.G. testified that he completed a drug and alcohol assessment, and his psychological evaluation before he went to jail in February 2016. He attended counseling once and attended, but did not complete, parenting classes. He was unable to complete any of his service plan. Foreman testified that, by and large, C.G. completed her service plan except for maintaining stable housing for at least six months prior to the dismissal date. C.G. stated that she had completed a twelve-week intensive outpatient substance abuse program and a twelve session domestic abuse treatment program, and continues to receive one-on-one counseling.

*Domestic violence and contact with G.G.*

According to Beamon, Foreman, and the CASA volunteer, Ellen Torres, the Department and CASA recommended that M.G. be returned to C.G. on a "monitored return" after a court date on July 15, 2016. According to the Department and CASA, C.G. claimed that she had no contact with G.G. since he was jailed in February 2016. However, Foreman became suspicious because she learned that C.G. was in constant contact with G.G.'s defense attorney and trying to use their marriage as a way of not testifying against him. She was concerned because these actions were completely opposite of her conversations with C.G. In April 2016, C.G. told Foreman that she had "absolutely" no contact with G.G., that she did not want to be a victim, and that she was cutting all ties with him.

The Department and CASA discovered that C.G. had received just shy of 400 telephone calls from G.G. who was in the Cherokee County jail. The calls were made from February 24, 2016 to July 7, 2016. C.G. also visited him at least five times and deposited money into his jail account. Foreman believed that C.G. had been "very deceptive," and noted that G.G. did not have the ability to make telephone calls from jail without money in his account. She was more bothered by C.G. answering the telephone calls than of him making them. Torres stated that recordings of the telephone calls revealed that the couple appeared very bonded, that they loved

each other, and that C.G. appeared to want to accept him back into her life. Foreman stated that the parents appeared to have an ongoing relationship, and had definite plans to get together after his release from jail. Moreover, Beamon stated that the recordings revealed a plan by the parents to deceive the Department and possibly take M.G. out of state once G.G. was released.

The Department was concerned because there was a history of domestic violence in C.G.'s and G.G.'s relationship. C.G. admitted that there were several episodes of domestic violence in their marriage, and G.G. admitted that he hurt his wife repeatedly even during the current Department investigation. Beamon stated that if G.G. were "permanently" removed from the household, it would significantly reduce the risk to the child. However, the Department did not trust C.G., and Torres stated that she had a "nagging fear" that if M.G. was returned to C.G., the father would eventually be in the child's life. Foreman did not believe C.G. made the changes necessary to be the parent that M.G. needs or that she has demonstrated a willingness and ability to protect M.G. from harm, to ensure her safety, or protect her from future abuse and neglect.

C.G.'s licensed professional counselor with the Crisis Center of Cherokee County, Rachel Bloser, stated that C.G. was progressing because she was beginning to question whether she and G.G. could be together. She opined that C.G. was improving. Bloser also explained that G.G. seemed to be controlling C.G. from jail and that accepting the calls could be part of a habit of being controlled or attached. C.G. testified that in 2012, G.G. was arrested for domestic violence against her. Even though she obtained an emergency protective order against G.G., she allowed him back in her house in violation of that order. Beamon stated that C.G. had red and purple bruising on her neck and arm after G.G. attempted to choke her. However, G.G. returned to their house after he was released from jail. According to Beamon, C.G. refused to let her take pictures of her injuries because she wanted to reconcile with him. C.G. stated that she signed an affidavit of nonprosecution regarding those charges against G.G.

In November 2015, G.G. become intoxicated, put a gun to C.G.'s chest and bruised her, and was arrested by law enforcement. However, G.G. returned to their house after he was released from jail. In this case, C.G. stated that she and G.G. went home together after he was released from jail. C.G. explained that she accepted G.G.'s calls from jail because she took her marriage vows seriously and felt sorry for him. She also stated that she tried to appease him by answering his telephone calls, and put money into his jail account because he begged her to do

12

so. C.G. stated that she and G.G. had some good memories and a child together. Further, she believed it would be good for M.G. to have supervised visitation with C.G. after he is released from prison. According to Beamon, C.G. told her that she did not want G.G. to be alone and that she wanted to support him.

*Plans for the Future*

C.G. stated that she planned to return to college, get a degree, and rejoin the workforce. She had sold her house, filed for divorce from G.G., and moved into her father's house on a farm. She planned to live there with M.G. However, Beamon stated that only after the Department changed their goal from a monitored return to termination did C.G. file for divorce, apply for protective order, move to her father's farm, and cease to communicate with G.G.

According to G.G., he could send letters and pictures to M.G. and talk to her on the telephone. The Department planned for M.G. to be adopted and there was testimony from a potential adoptive father as to his and his wife's plans to adopt M.G. Beamon, Foreman, and the CASA volunteer believed it was in M.G.'s best interest for C.G.'s and G.G.'s parental rights to be terminated.

*The Child*

M.G. was described as charming, intelligent, sweet, and loving. However, she was extremely overweight when she was removed from the home. According to Torres, M.G.'s current placement has been good for M.G. She has lost weight, participated in her own personal care, was physically active, and enjoyed activities, such as dance, ballet, and attending football games with her foster family. M.G.'s counselor stated that the child had issues related to the removal and loss due to the abrupt removal from the home. The counselor believed that M.G. was exposed to some violence and family chaos, and did not cope well. She told the counselor that there were times when she did not feel safe with her parents. According to the counselor, M.G. has improved social skills, improved ability to regulate herself, and improved ability to express herself with words as opposed to acting out. M.G. shows signs of increased comfort and trust in her current placement. The counselor testified that if M.G.'s parental home environment had not changed, it would be detrimental for M.G. to be returned to it. According to the CASA volunteer and counselor, M.G. expressed her desire to return to her mother and appeared to be very bonded to C.G. However, the foster mother stated that M.G. also viewed adoption positively and was excited about the possibility.

## Conclusion

Viewing the evidence in the light most favorable to the trial court's finding, a reasonable fact finder could have concluded that G.G. has an extensive criminal record, committed domestic violence against C.G. in the past, including within a year of the trial, did not complete any of his service plan, had an extensive history of drug and alcohol abuse, and had been sentenced to five years of imprisonment in the summer before trial. Moreover, a reasonable fact finder could have concluded that C.G. was an alcoholic, had a pattern of sobriety followed by relapses, had a pattern of drinking until she passed out, had a mental health history, had at least six Department investigations involving her children, and had a pattern of unsanitary and unsafe conditions in her home. Further, a reasonable fact finder could have also concluded that C.G. had been a victim of domestic violence committed by G.G., had a pattern of reconciling with him and allowing him back into her home after each incident, had caused M.G. to be exposed to violence and chaos, and had visited him, accepted telephone calls from him, and put money into his jail account less than three months before trial.

Considering the evidence relating to the statutory and *Holley* factors in the light most favorable to the trial court's findings, we hold that a reasonable fact finder could have formed a firm belief or conviction that termination of C.G.'s and G.G.'s parental rights is in the best interest of the child. *See **In re J.F.C.**,* 96 S.W.3d at 266.

C.G. argues in her brief, however, that her telephone contacts with G.G. do not amount to clear and convincing evidence. She also contends that the Department made no effort to discuss these transgressions with her. G.G. argues in his brief that his relatively stable recent history should not be overlooked. But this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that termination of C.G.'s and G.G.'s parental rights is in the best interest of the child. *See id.* Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of C.G.'s and G.G.'s parental rights is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we overrule G.G.'s fifth issue and that part of C.G.'s first issue regarding best interest.

## DISPOSITION

Having overruled all of G.G.'s and C.G.'s issues, we ***affirm*** the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered May 26, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

15



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 26, 2017**

**NO. 12-16-00312-CV**

**IN THE INTEREST OF M. G., A CHILD,**

Appeal from the County Court at Law

of Cherokee County, Texas (Tr.Ct.No. 2015-09-0581)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*